CHEMICAL NAT. BANK v. ARMSTRONG.

*(Circuit Court, S. D. Ohio, W. D.    June 2, 1892.)*

No. 4,339.

1. BANKS—VALIDITY OF LOAN—AUTHORITY OF VICE PRESIDENT—FRAUD.
    The C. Bank in good faith advanced money on collateral forwarded to it by the vice president of the F. Bank, and charged the loan to the F. Bank. The vice president of the F. Bank directed that the loan be transferred to his individual credit, which was done, whereupon he fraudulently checked out the same for private purposes. *Held*, that the vice president had authority to negotiate the loan, and that the validity thereof was not affected by his fraud.

2. SAME—NATIONAL BANKS—INSOLVENCY—BASIS OF DIVIDENDS.
    Rev. St. §§ 5235, 5236, which provide, respectively, that the comptroller, on appointing a receiver for an insolvent national bank, shall advertise for proof of claims, and that he shall make a ratable dividend of the moneys paid over to him by the receiver among those who have proved their claims, cannot be construed to fix the date of the suspension of the bank as a date with reference to which all calculations of the amount due to creditors are to be made as a basis of dividends. Therefore, where after such suspension, but before the filing of a claim with the receiver, such claim was reduced by collections from collaterals, it should have been credited with such collections when filed, and the balance then found due used as the basis for ascertaining claimant's dividend.

3. SAME—BASIS OF DIVIDEND—COLLECTIONS ON COLLATERALS.

The C. Bank advanced a large sum of money to the F. Bank in March on collaterals, and in June advanced a further sum on further collaterals. The C. Bank collected $75,000 on the March collaterals after the maturity of the March loan, but entered a general credit thereof to the F. Bank. *Held*, that the collections should have been applied to the March loan, and were properly deducted therefrom in determining the amount which the C. Bank was entitled to receive as a dividend from the assets of the F. Bank after its insolvency.

4. SAME—LOSS OF COLLATERALS—NEGLIGENCE OF HOLDER.

Among the collaterals to secure the March loan was a note of W. for $25,000, indorsed by L. for accommodation of the vice president of the F. Bank. Shortly before maturity of this and other of the collaterals, said vice president requested that they be not presented for payment, but returned, promising that other collateral should be substituted for them, all of which was done, except that the $25,000 note was not returned. The F. Bank did not order back this note, and shortly afterwards it matured without presentment or notice of dishonor to L., the indorser, who was the only solvent party to the note. *Held*, that the C. Bank, having by its negligence failed to preserve the liability of the indorser, was chargeable with such note as so much received on its claim.

5. SAME—DEFENSES.

It was no excuse to the C. Bank that the F. Bank was not a party to the note in question, the C. Bank having received it as security for a loan to the F. Bank under circumstances from which it might naturally infer the note to be the property of the F. Bank.

6. SAME—AVAILABILITY OF COLLATERAL—ACCOMMODATION PAPER.

The objection by the C. Bank that the note was made and indorsed merely for the accommodation of the vice president, who was not a party thereto, and that consequently the C. Bank could not have recovered thereon if the indorser's liability had been preserved, could not be maintained, in view of the fact that the indorser had paid three notes, companions to that in question, without objection, and of evidence that he was interested with the vice president in procuring the loan which the note partly secured.

7. SAME—INTEREST ON DIVIDENDS—ESTOPPEL.

The C. Bank, having refused an offer of the receiver to pay dividends on $200,000, which was about the amount due to it on the March loan after deducting collections on collaterals, was not entitled to interest on such dividends on affirmance of the action of the receiver by the court.

8. SAME—DIVIDENDS—COLLECTIONS ON COLLATERALS.

A sum collected by the C. Bank on the collaterals after proof of its claim should not be deducted therefrom in ascertaining the amount on which it is entitled to a dividend.

In Equity. Suit by the Chemical National Bank against David Armstrong, receiver of the Fidelity National Bank. Heard on the pleadings and evidence. Decree for defendant.

Statement by SAGE, District Judge:

On the 2d of March, 1887, the Chemical National Bank, of New York, credited on its books the Fidelity National Bank, of Cincinnati, with a temporary loan of $300,000, at interest, on the faith of a letter from that bank, signed by E. L. Harper, its vice president, dated February 28, 1887, requesting such credit, and inclosing its certificate of deposit No. 345, to the order of E. L. Harper, and by him indorsed in blank.

There were also inclosed with the letter sundry bills receivable as collateral. The letter was signed by Harper, as vice president, but was not copied in the letter book of the bank, and it does not appear that any other officer of the bank knew of its existence. The Chemical National Bank at the time notified the Fidelity Bank that it had placed $300,000 to its credit. E. L. Harper received the notice, and at once directed that the sum so credited be transferred to his individual account, which was done, and immediately afterwards he checked it out for his private purposes.

In April, 1887, the Chemical Bank sent to the Fidelity Bank two statements of the transactions between the banks in March. In each of these the $300,000 loan was credited to the Fidelity Bank under date of March 2, 1887, as "loan" or "tem. loan." May 19, 1887, the Fidelity Bank, by telegram, signed with its own name, and by confirming letter, signed "E. L. Harper, V. P.," requested the Chemical Bank not to present any of the paper pledged as collateral for the $300,000 loan for payment, as payment would be arranged for at the Fidelity Bank, and new paper would be sent on the 20th in substitution for maturing collateral. The letter promised to pay on July 15th, with interest.

On May 21, 1887, the Fidelity Bank, by letter signed by E. L. Harper, V. P., transmitted sundry bills receivable as collateral for the $300,-000 loan, and requested the return of certain of those previously transmitted, which would mature in May or June, and the substitution was made as requested. On June 14, 1887, the Fidelity Bank sent to the Chemical Bank over $1,000,000 face value of other collateral, and requested other advances, and certain advances were made by the Chemical Bank in response to that request. On June 21, 1887, the Fidelity Bank suspended payment, and on June 27, 1887, the defendant, Armstrong, was appointed its receiver by the comptroller of the currency.

Collections made by the Chemical Bank of the collaterals pledged to it by the Fidelity Bank for the various advances stated above were all credited on the books of the Chemical Bank in one account, regardless of when the collateral was pledged, or in connection with what particular loan; the theory of the Chemical Bank being that it had a lien on all the collateral to secure all the advances. By the fall of 1887 more than enough had been collected upon the collaterals to satisfy all the loans, if applied according to the theory upon which the credits were made. The Chemical Bank thereupon notified defendant, Armstrong, of this fact, and offered to remit to him the surplus cash collected, and return the collateral still uncollected. Armstrong, however, contended that the collateral pledged in June, 1887, was security only for the advances thereafter made, and that the Chemical Bank had no right to apply collections from that collateral to payment of the March loan. Suit was thereupon brought by Armstrong, receiver, against the Chemical Bank, in the United States circuit court for the southern district of New York, for an accounting of the June collateral upon this basis. That suit resulted in a decree in favor of Armstrong for the surplus of the collections from the June collaterals over the June advances, with interest. The case is reported in 41 Fed. Rep. 234. The result was that the loan of March, 1887, was left unpaid, and the Chemical Bank had in its hands the unpaid collateral pledged in March and May, 1887, to secure that loan; also proceeds of collaterals paid, amounting to $75,000. Thereupon the Chemical Bank made formal proof of claim upon that basis, asking to be enrolled as a creditor for $300,000, with interest at 6 per cent. from March 2, 1887, and to be paid dividends ratably with other creditors, until the dividends and collections made and to be made from the collateral should equal the amount due upon the loan. The claim as made was rejected, the rejection being accompanied with an offer, in

substance, to pay dividends calculated upon the balance remaining due upon the claim after deducting the collections made, and to be made, from the collateral, and a further sum of $25,000 which it was claimed was lost through negligence of the Chemical Bank in not taking proper steps to collect a note for that amount held by it as collateral, made by J. W. Wilshire, and indorsed by J. V. Lewis, falling due June 28, 1887.

Thereupon this suit was brought to compel the allowance of the claim as presented by the Chemical Bank, and the payment of dividends on the amount due at the time of the appointment of defendant as receiver, the dividends to cease when, together with the collections from the collateral, they should equal the amount due upon the claim. The answer sets up that the entire transaction was in furtherance of a scheme by Harper to swindle the Fidelity Bank; that the certificate of deposit for $300,000, which was forwarded to the Chemical Bank by Harper, was not entered on the books of the bank; that Harper had not that sum at that date on deposit in the bank; that the issuing of the certificate was not known to or authorized by the directors of the bank, and that the proceeds obtained from the Chemical Bank were not received by the Fidelity Bank, but were fraudulently appropriated by Harper to his own use. The defendant further sets up that, by reason of the default of the complainant, there was no demand of payment or notice of nonpayment of the collateral note for $25,000, above referred to, made by Wilshire and indorsed by Lewis, and that therefore the amount of said note was lost, Wilshire being insolvent and Lewis abundantly able to pay, but claiming exemption by reason of said note not having been presented for payment at its maturity, and notice of nonpayment not having been given to him.

The defendant further admits that the complainant presented the claim sued upon to him on the 25th of April, 1890, which was the first presentation thereof, and that he did then in writing offer to admit and pay dividends on the sum of $200,000; that being about the amount which the defendant believed to be due after making the credits which are set forth in the answer, and to which he claimed to be justly entitled, and further offered to pay said dividends and allow said sum without prejudice to the right of the complainant to sue for the residue of the claim as presented by it, which offer was refused.

The evidence is undisputed that the Chemical Bank was not in any way a party to any fraud attempted and practiced by Harper, but dealt in good faith with the Fidelity National Bank. It further appears from the evidence that of the collateral held by the Chemical Bank as security for the $300,000 loan at the time of the failure of the Fidelity Bank, only four notes, aggregating $19,200, and falling due in July and August, 1887, had at any time belonged to the Fidelity Bank. To whom the residue belonged prior to the pledge of the Chemical Bank does not appear. Among the collateral notes pledged in March were four for $25,000 each, drawn by Joseph W. Wilshire to the order of J. V. Lewis, and indorsed by him, all dated February 25, 1887, and payable, re-

spectively, at three, four, five, and six months after their date. All these notes were made by the maker and indorser for the accommodation of E. L. Harper, and given to him on their date. The note falling due in May, 1887, was returned in accordance with the request of May 21, 1887. The note falling due in June, 1887, was in the possession of the Chemical Bank at its maturity, and is unpaid. No proper notice of nonpayment was given to Lewis as indorser, and, as already stated, he claims to be discharged. The two remaining notes were paid by Lewis at maturity, and he also paid at maturity another note for $25,-000, made by Wilshire, dated April 28, 1887, and payable five months after date to the order of Lewis, and indorsed by him. This note was among the collaterals substituted in May, 1887.

These payments by Lewis were the only payments made on account of any of the collateral held for the $300,000 loan prior to the commencement of this suit, but since then compromises have been made by the defendant of the four notes aforesaid of the Champion Machine Company, resulting in a payment of some cash and the substitution of other securities, and upon certain notes drawn by Whitely, Fassler & Kelley, and indorsed by E. L. Harper & Co., these being among the notes pledged in May, to which the Fidelity Bank had no title. There has been paid to the complainant the sum of $4,481.49 in cash, and the bonds of Whitely, Fassler & Kelley secured by mortgage to the amount of $9,600. The defendant in his answer avers that the Fidelity Bank was not liable to the complainant for the amount of said $300,000 loan, and that the complainant is not entitled to prove the same as valid as against the trust estate held by him. The prayer of the answer is that, if the court shall find that the Fidelity Bank was liable for the amount of said loan, all payments made to the complainant from the collateral paper not belonging to the Fidelity Bank, and forwarded by Harper to the complainant as security for said loan, shall be credited thereon; that the amount of the unpaid Wilshire note shall be charged against the complainant, and credited on said loan; and that the balance of the collateral shall be first exhausted, and the proceeds credited on the loan, and the complainant be permitted to prove only the amount remaining due on the loan after said credits have been made.

*Wm. Worthington,* for plaintiff.

*John W. Herron,* for defendant.

SAGE, District Judge, (*after stating the facts as above.*) Conceding that the transaction of the $300,000 loan was fraudulent as between E. L. Harper and the Fidelity Bank, and that he appropriated the entire proceeds to his individual use, the claim of the Chemical Bank, which dealt in good faith in the transaction, and was innocent of any knowledge or participation in the fraud, is not affected thereby. The negotiation of the loan was within the authority of Harper, as vice president of the Fidelity Bank, and, if he used that authority fraudulently for his own advantage, the bank that enabled him to commit the fraud must suffer the consequences, and not the bank that made the loan and

advanced the money, under the representation and in the belief that it was conducting a fair, legitimate business transaction with the Fidelity Bank.

The only questions to be decided are—

(1) Upon what sum shall dividends be computed?

(2) Shall the Chemical Bank be charged with the $25,000 Wilshire-Lewis note, due June 28, 1887, as if it had been collected?

(3) Shall interest be allowed the Chemical Bank upon the sum which may be found due to it for dividends?

In Lewis v. U. S., 92 U. S. 618, 623, the principle of equity that a creditor holding collaterals is not bound to apply them before enforcing his direct remedies against the debtor is recognized as settled. The authorities in support of the principle as stated are numerous. So far as it relates to the collaterals yet remaining in the possession of the Chemical Bank, there is no difficulty about its application in this case. The contention arises upon the question whether the sums that have been paid to and received by the Chemical Bank on account of collateral notes pledged to it to secure the loan shall be first credited, and dividends paid on the residue; or, on the other hand, dividends shall be paid upon the entire amount as if those payments had not been made, and then the payments applied. The statutory provisions bearing upon the questions are sections 5235 and 5236, Rev. St. U. S. Section 5235 requires the comptroller, upon appointing a receiver for an insolvent national banking association, to give newspaper notice for three consecutive months, "calling on all persons who may have claims against such association to present the same, and to make legal proof thereof." Section 5236, so far as here material, requires the comptroller to make a ratable dividend of the moneys paid over to him by the receiver—

"On all such claims as may have been proved to his satisfaction, or adjudicated in a court of competent jurisdiction; and, as the proceeds of the assets of such association are paid over to him, shall make further dividends on all claims previously proved or adjudicated."

The contention for the complainant is that the statute fixes one time, with reference to which all calculations of the amount due to creditors are to be made as a basis for dividends, and that that time is the date of the suspension of the bank, at which counsel say the active trust in favor of creditors begins to run. The argument is that it will not do to take the maturity of the claim, for that throws interest out of view altogether, and that the time when the proof of the claim is tendered cannot be taken, for that would introduce variations because of difference in dates of interest, and would permit a creditor having a high rate of interest to get an advantage over others, by postponing his time of proof, and thus swelling the amount due him.

For a similar reason it is urged that the date when the claim is allowed or adjudged cannot be taken. The contention is that the statute necessarily contemplates an estimation of all claims at one and the same instant of time; and that reason, as well as convenience, dictates that time to be the date of the commencement of the trust; that is to say, the date

of the suspension of the bank. In support of this contention *White* v. *Knox,* 111 U. S. 784, 4 Sup. Ct. Rep. 686, is cited. That case is an authority for the proposition that all creditors are to be treated alike with reference to the payment of interest. White had obtained judgment on the 23d of June, 1883, upon a claim which had remained due and unpaid from the date of the suspension of the bank and the appointment of the receiver, which was about the 20th of December, 1875. Between that date and the judgment, the comptroller had paid to other creditors dividends amounting in the aggregate to 65 per cent. upon their respective claims as of the date when the bank failed. White's judgment included interest to the date of its rendition, and he claimed a dividend on the amount thus obtained. The comptroller paid him a dividend upon the same basis as that adopted for dividends to the other creditors. The difference between that amount and the amount claimed by White as the basis for his dividend was $21,379.66. Suit was brought to compel the payment of dividends on that difference. The supreme court upheld that rule of distribution, Chief Justice WAITE saying, in the course of his opinion, that, "if interest is added on one claim after that date before the percentage of dividend is calculated, it should be upon all; otherwise, the distribution would be according to different rules, and not ratable, as the law requires."

In none of the cases decided by the supreme court does it appear that any payment on account of the indebtedness of the creditor was made from the proceeds of collaterals, or otherwise, after the suspension of the bank and before the proof of claim. There are two or three cases in Pennsylvania in which the doctrine claimed by counsel for complainant is approved, but the weight of authority is the other way. In *Lewis* v. *U. S.,* 92 U. S. 618; *Case* v. *Bank,* 100 U. S. 446; and *Eastern Townships Bank* v. *Vermont Nat. Bank,* 22 Fed. Rep. 186,—the claim proven was for the entire amount of the principal of the indebtedness as it existed when proven and at the date of the failure of the bank, for nothing had been realized from collateral, and there had been no partial payments, and the question as to the time with reference to which the amount due should be adjusted related exclusively to the payment of interest. In this case a different state of facts exists. After the suspension of the Fidelity Bank, and before the Chemical Bank made any proof of its claim, it realized $75,000 from the payment of collaterals, to wit, three of the Wilshire-Lewis notes, as follows: $25,000 on the 23d of July, 1887, $25,000 on the 24th August, 1887, and $25,000 on the 1st of October, 1887, the dates at which said notes respectively matured. These payments were entered up on the books of the Chemical Bank at the dates of their receipt to the credit of the general collateral account of the Fidelity Bank. The Chemical Bank treated the collaterals received in March and May and June as all belonging to one and the same account, or, in the language of the cashier of that bank in his testimony, "as massed;" and so with the loans, the bank acting on the erroneous theory, already stated, that it had the right to apply the proceeds of all the collaterals to the payment of all or any part of the indebtedness of the Fidelity Bank. The question

then is how the payment of these amounts, before the filing of the claim of the Chemical Bank with the receiver, is to be regarded. Was the Chemical Bank bound to credit them on its claim, or did it have the right to prove and receive dividends upon the entire claim, holding the amounts received from the collaterals back, to be applied, after the receipt of the dividends, to the residue of the claim? It is urged that the entries of credit ought not to conclude the Chemical Bank, because they were made upon the theory that the loans and the collaterals were to be treated as belonging to one transaction. Conceding that the Chemical Bank is not concluded by the entries, how does the matter stand? The provision in section 5236 of the Revised Statutes is for the payment by the comptroller of ratable dividends "on all such claims as may have been proved to his satisfaction, or adjudicated in a court of competent jurisdiction." The first thing for a creditor to do, then, is to make proof of his claim, and there seems to me to be no escape from the conclusion that the claim must be proven as it exists when the proof is made. What, then, was the true amount of the claim when the proof was made by the Chemical Bank? It had received negotiable securities as collateral. It is stated at page 213 in Schouler on Bailments that the rule deducible from the decisions is that "the pledgee of negotiable securities not only has the right, but is bound, in the exercise of ordinary diligence, to make presentment or collection on their maturity, and then apply the proceeds on the pledged account."

In *West* v. *Bank*, 19 Vt. 403, Judge REDFIELD, on page 409, says: "It is true that if the security had been converted into money, and it is between debtor and creditor, it ceases to be collateral, and operates directly as payment, so that the debt is thereby reduced, and the creditor can only go for the balance." In *Sohier* v. *Loring*, 6 Cush. 537, the court held that any proof sought to be made by a creditor after he has been paid any part of his claim can be only for the unpaid balance. Judge LOWELL says in *Re Souther*, 2 Low. 320, that in bankruptcy no creditor can prove for more than his actual debt as it exists at the time of the proof, without obtaining an undue advantage over other creditors. It was held by the court of appeals of Maryland in *Bank* v. *Lanahan*, 7 Atl. Rep. 615, decided January 5, 1887, that a creditor who had realized on collaterals was entitled to a dividend, under an assignment for the benefit of creditors, for only the residue of his claim after deducting the amount realized on the collateral. The court said that it could not be denied that the sum received from the collaterals diminished the indebtedness, and that the creditor had thereby actually received payment to a certain extent. In *Mason* v. *Bogg*, 2 Mylne & C. 448, Lord Chancellor COTTENHAM said that in equity a party might come in and prove without giving up or affecting his securities, except so far as the amount of his debt may be diminished by what he may receive; and in *Kellock's Case*, 3 Ch. App. 769, Sir WILLIAM PAGE WOOD, in deciding the case, referred to the right of the creditor to stand upon his securities until they are redeemed; and in *People* v. *E. Remington & Sons*, 121 N. Y., at page 336, 24 N. E. Rep. 793, the court said that the creditor was entitled to

prove against the estate for what was due to him, and receive a dividend upon that amount without deduction on account of collateral securities held by him. In *Wheeler* v. *Newbould*, 16 N. Y. 392, the court of appeals held that, where negotiable securities are pledged for a loan, "the primary, and, indeed, the only, purpose of the pledge is to put it in the power of the pledgee to reimburse himself for the money advanced when it becomes due and remains unpaid. The contract carries with it an implication that the security shall be made effectual to discharge the obligation." The court further held that it would be presumed, in the absence of express stipulations to the contrary, that it was the intention of the parties to the contract that the creditor should, if he resorted to the pledge instead of the personal liability of the debtor, accept the money upon the hypothecated securities, as it became due and payable, and apply it to the satisfaction of his debt. The general law with reference to the appropriation of payments is that, if the party who pays money does not make a specific application at the time of the payment, the right of application devolves on the payee, and he must then exercise it, or the law will exercise it for him. It has been held that, if money is paid to the pledgee before the maturity of the principal note, he has no right to apply the proceeds to the payment of that note until it matures, and that in such case the money when received is a substitute for the collateral note on account of which it was paid, and is to be held upon the same terms and subject to the same rights and duties as the collateral note. *Garlick* v. *James*, 12 Johns. 148. But in this case the payments of the collateral notes were made after the maturity of the loan, and it was the duty of the Chemical Bank to apply them at once as credits upon its claim, upon the loan against the Fidelity Bank. A general credit was entered, and it must stand as a credit against that loan. It results that when the Chemical Bank presented its claim there should have been credited upon it the amount realized from collaterals, and the claim for $300,000, the full amount, was rightly rejected.

The next question is whether the Chemical Bank shall be charged with the $25,000 Wilshire-Lewis note, due June 28, 1887, as if it had been collected. The facts relating to this branch of the case have already been stated in a general way, but it is now necessary to refer to them more particularly. That note was among the collaterals originally pledged for the payment of the $300,000 loan. On the 19th of May, 1887, the Fidelity National Bank telegraphed the Chemical Bank: "We send other bills to take place. Will want all returned here without presenting, as we advised parties to arrange payment here." On the same day the Fidelity Bank by letter, over the signature of "E. L. HARPER, V. P.," wrote the cashier of the Chemical Bank as follows:

"Please do not present any of the collateral paper for payment. We have advised parties we would order back and charge up here. We will to-morrow send you new notes to take the place of ones maturing. We will pay the loan July 15th, and will pay interest till that date, if agreeable to you."

The $25,000 note was not ordered back by the Fidelity Bank, but on the 21st of May, 1887, sundry other bills receivable, which would mature

in May or June, and which were held as collateral, were called home by the Fidelity and others substituted. On the 28th of June, 1887, seven days after the suspension of the Fidelity Bank, and one day after the appointment of Armstrong, as receiver, the $25,000 note matured. It was then held as collateral by the Chemical Bank. There was no presentment or demand for payment, nor any notice of nonpayment to Lewis, the indorser, who was abundantly able to pay, whereas Wilshire, the maker, was insolvent. The cashier of the Chemical Bank testifies in his deposition that the 28th of June came, and the note had not been returned to Cincinnati, and that night he discovered that fact, and wired Wilshire and Lewis at the place where he supposed they would be found, and where the note was payable, namely, Cincinnati. He says that the loans were in the hands of the loan clerk, who did not call his attention to the $25,000 note, the note clerk acting on the presumption that the telegram and letter of May 19th were authority; but the cashier, happening that afternoon to have some time, got out the papers, and was looking them over, and, as he says, "was more than surprised to find this piece of paper on hand," referring to the note, and at once—it was then about half past four—"did his duty and notified the parties." He also testifies that he knew of the failure of the Fidelity Bank on the 21st of June, he thinks, or the 22d.

It is urged for the Chemical Bank that it had the right to assume that it was to do nothing with respect to presentment, demand, or notice of nonpayment of this note; that the instructions contained in the telegram and letter of May 19th continued in force until altered by positive directions. Also, that the evidence shows that the Fidelity Bank never was the owner of this note, and that it was an accommodation note for the use of Harper, which the Chemical Bank, as an innocent purchaser for value before maturity, had the right to enforce; but, as far as Lewis was concerned, that right existed only in case the Chemical Bank could not otherwise collect its debt as against him; that the lien of the Chemical Bank extended only so far as necessary for its own protection, and, if Lewis had paid the note, he would have been subrogated to the rights of the Chemical Bank against the Fidelity, and the securities belonging to that bank, after the Chemical Bank had been paid the residue of its claim; also that Lewis was practically a surety for the Fidelity Bank, which was the principal debtor. The argument for the defendant is that it appears from the evidence that the money on the $300,000 loan was borrowed by E. L. Harper in the name of the bank, but for his own use, without any authority or knowledge of the other officers of the bank, and by the perpetration of a fraud on all the parties concerned; and that the proceeds of the loan were immediately placed to his individual credit, and drawn out for his own use. Counsel say that if Harper had paid that debt, or any part of it, he could not prove the sum so paid as a claim against the Fidelity National Bank, and that the same rule applies to collections from collaterals furnished by him, whether belonging to or only controlled by him.

The argument is further that the complainant had knowledge or

reason to suppose that the collaterals belonged to the Fidelity National Bank; that that would have been naturally and properly inferred by the complainant from the manner in which it obtained possession of them, and the manner in which they were sent to it, and therefore the complainant cannot complain if the same results should follow as would have followed had they actually belonged to the Fidelity Bank.

As to the claim that the Wilshire-Lewis notes were accommodation notes loaned to Harper, and that no consideration was received for them by Lewis and Wilshire, attention is called to the only testimony upon that part of the case,—the deposition of Wilshire,—and to the fact that Lewis, who paid three of the notes as indorser, has neither testified nor made any claim of the kind stated. Harper's name does not appear upon those notes, and, according to Wilshire, nothing was said about paying them or in any way taking care of them. The transaction occurred at Wilshire's house, in Cincinnati, on the night of February 25, 1887, Wilshire, Harper, and Lewis being present, and all taking part in the conversation. Harper stated that he required additional funds to carry on a certain deal which he had on hand at that time, that he did not have the amount of ready money in possession, but that he could use paper, discounted either in his own bank or elsewhere, and Wilshire testifies that notes were made for that purpose, but nothing at all was said as to who was to take up the notes. Harper spoke of the condition of the market, the favorable outlook, and the necessity of having ample money to protect the deal; also, that while the deal was very promising, and the prospects for a successful termination favorable, yet with the opposition at Chicago it was best to be prepared to furnish additional margin when called for; that, although the money was not needed then, it possibly might be later on, and Harper wanted to be prepared for it. Why Lewis was interested in assisting Harper does not appear from Wilshire's deposition. Wilshire himself was Harper's broker. The argument is that, the paper having been made to enable Harper to borrow money upon it, neither Wilshire nor Lewis can plead that it was accommodation paper as against the party who loaned the money on the faith of it; and that, while it is true that the Fidelity Bank did not primarily lend the money on that paper, it did loan its credit, and thus obtained the money and gave it to Harper, thereby accomplishing the object intended by Lewis and Wilshire, and therefore having the same right to protection on its credit as if it had primarily made the loan. I am satisfied that this is the correct view of the transaction, and that, as to the three $25,000 notes that were paid, inasmuch as Lewis and Wilshire knew that they were to be used to obtain money to aid Harper in a deal in which they were in some way sufficiently interested to furnish $100,000 of negotiable security, they would not be entitled to prove up any claim against the Fidelity Bank. This brings us back to the question whether the failure of the Chemical Bank to make demand of payment of the $25,000 note due June 28th was warranted by the telegram and letter of May 19th. My conclusion is that it was not. Those advices were followed by the letter of May 21st, calling home certain of the securities

which would mature in May and June, but not the $25,000 note. The omission of that note from that call was of itself sufficient to indicate that it was not the intention to order it back to Cincinnati. It remained as collateral in the hands of the Chemical Bank until its maturity. The Fidelity suspended payment on the 21st of June, and that fact was known to the Chemical Bank on that day or the day following. It was clearly the duty of the Chemical Bank to observe the ordinary rules binding upon the holder of negotiable securities as collateral, with reference to presentment for payment and notice of nonpayment. The failure to do so was a neglect which was called an "oversight," and which, when it was discovered by the cashier, it was too late to remedy. The note should have been sent by the Chemical Bank to its correspondent at Cincinnati, where it was payable, in time for presentment and demand, and, in the event of nonpayment, of notice. This not having been done, the claim against the only solvent party to the note was lost, and the amount must be charged to the Chemical Bank as if the note had been paid.

With reference to interest, this court has the right to take judicial notice of the fact which appears in its own records, although it is not shown in evidence in this case, that no interest has been paid upon claims proven against the Fidelity Bank, excepting in cases where claims rejected by the receiver were subsequently affirmed by the judgment of this or some other court of competent jurisdiction. In such cases interest has been allowed from the date when dividends were withheld that should have been paid. There is another consideration which cannot be overlooked. When the complainant proved its claim for the entire amount of the $300,000 loan, the receiver offered to pay the dividends on $200,000, without prejudice to the right of the complainant to litigate its claim for the residue. The offer was rejected, with the result to lock up, pending the litigation, the amount which would have been paid in dividends on $200,000. Applying the maxim that he who seeks equity must do equity, the complainant will not now be allowed interest on the amount which was offered to and rejected by it. The true amount on which dividends should be allowed will be ascertained by adding to the principal of the loan interest thereon from the 2d of March, 1887, its date, to June 21, 1887, the date of the suspension of the Fidelity Bank, and then deducting the $75,000 realized from the three Wilshire-Lewis notes which were paid, and $25,000 on account of the $25,000 Wilshire-Lewis note that was not presented for payment nor protested. The claim of the complainant is subject to a further credit of $4,481.49, cash realized from the Whitely, Fassler & Kelley notes, and the notes of the Champion Machine Company, but that credit is not to affect the dividends, for the reason that it was realized subsequent to the proof of complainant's claim. Interest will be allowed on the amount of the dividends on the excess of complainant's claim over $200,000, to be reckoned from the date of the proof of the claim.