### ALLIS–CHALMERS MFG. CO. v. CITIZENS' BANK & TRUST CO.

(District Court, D. Idaho, E. D. November 24, 1924.)

**1. Banks and banking ⬅99—Bank not party to paper may bind itself as guarantor.**

A bank may become guarantor of commercial paper to which it is not otherwise a party, but to be valid such guaranty must not only have been made for a valuable consideration, but it must in some way have been a part of and incident to its banking business.

**2. Banks and banking ⬅99—Guaranty by bank held within the scope of its authority.**

Plaintiff held an account against a milling company for part of the price of the machinery installed in its mill, to which plaintiff retained title as security. The milling company became largely indebted, defendant and another bank being its principal creditors. After a conference of creditors, the company executed a

mortgage to the two banks as trustees, subject to plaintiff's claim, which plaintiff extended, taking the company's note, guaranteed by defendant bank; the other bank having failed. The removal of the machinery would have made it impossible to continue the mill in operation, and from such operation by a lessee defendant realized as trustee more than sufficient to pay the note. *Held* that, under the circumstances, the guaranty was not only a reasonable, but a necessary, incident to defendant's banking business, and was within the scope of its power to execute.

### 3. Banks and banking ⬩⬤ 105(2)—President held to have authority to execute guaranty.

Where a bank took a mortgage to secure an existing indebtedness to it of over $100,000, on property subject to a prior claim of less than $20,000, enforcement of which would have seriously imperiled the security, its president, who had been its active business manager for eight years, and accustomed to act for it without formal authority from the directors, *held* to have authority, acting in good faith and in its interest, to execute a guaranty of such claim on behalf of the bank to secure its renewal.

At Law. Action by the Allis-Chalmers Manufacturing Company against the Citizens' Bank & Trust Company. Judgment for plaintiff.

Peterson & Coffin, of Pocatello, Idaho, for plaintiff.

H. B. Thompson, of Pocatello, Idaho, for defendant.

DIETRICH, District Judge. The defendant, Citizens' Bank & Trust Company (formerly known as the Citizens' Bank), was organized as a state bank under the laws of Idaho, and for many years has been engaged in the general banking business at Pocatello, Idaho. From 1913, and at all times herein mentioned, one I. N. Anthes, or (after marriage) I. N. Greene, or I. N. Anthes-Greene, was its president, and in fact its "active managing head." By a letter dated October 19, 1922, she transmitted by mail to the plaintiff at its place of business in Milwaukee, Wis., a promissory note for $15,-000, dated October 11, 1922, due in 60 days, and executed by the Pocatello Milling & Elevator Company, a corporation of Pocatello, in favor of the plaintiff, with the statement, among others, that: "This renewal note is sent you under the same terms as the original note; that is, under our guaranty. Kindly return the old note, of which this is a renewal." The letter was upon the letter head of the defendant bank, and was signed, "I. N. Anthes-Greene, President." Apparently the old note bore an indorsement of guaranty, and upon receiving the proposed renewal, without such indorsement, plaintiff promptly returned it to defendant, calling attention to the omission. Thereupon Mrs. Greene indorsed thereon: "Payment guaranteed. Citizens' Bank in Pocatello, Idaho. I. N. Greene, President"—and again sent it to the plaintiff, who accepted it. No part of it has been paid, and plaintiff brings this action upon the guaranty.

[1] It is conceded that the note is a valid obligation of the Milling Company, that defendant's president indorsed the guaranty thereon, and that it has not been paid. The defenses are that (1) in respect to defendant such a guaranty is ultra vires; (2) in respect to defendant's president, she acted without authority; and (3) the undertaking was without consideration. The first and last defenses are closely related, and may properly be disposed of together.

It is thought to be true, and defendant concedes, that a bank is without the power to make an accommodation indorsement or guaranty. Such an undertaking would clearly be without the scope of banking. But it does not follow that in no case can a bank enter into a valid obligation of guaranty. A guaranty is perhaps less onerous than an indorsement. People's Bank v. National Bank, 101 U. S. 181, 25 L. Ed. 907. One of the common daily incidents of banking under the Federal Reserve system is the indorsement or guaranty by a member bank of commercial paper rediscounted by it with the Federal Reserve Bank; and in the ordinary course of banking, contingencies may arise where, to protect its important interests and to avoid substantial loss, a bank may find it necessary incidentally to exercise such a power. Hence we cannot say as a matter of law that a banking transaction is ultra vires merely because it involves an indorsement or guaranty of commercial paper to which the bank is otherwise not a party.

The validity of the undertaking will in each instance depend upon the consideration therefor, and the attendant circumstances, including the relation of the transaction to the business of the bank. The mere fact of a valuable consideration is not alone controlling. However adequate, compensation for the service would not warrant a bank in engaging in the surety business, or give validity to its engagement of suretyship. If the guaranty in question is to be held valid, it must not only have been for a valuable consideration, but it must in some way have been a part of, and incident to, defendant's banking business. Whatever the consideration, if outside of the scope of such business,

and in no wise incidental or contributing thereto, it is ultra vires and void.

[2] Under the statutes of Idaho (sections 5663 and 5664, Compiled Statutes), the guaranty, being in writing, imports a consideration, and we turn to the record to discover what relation, if any, it had to the defendant's banking business. The note represents the balance of an indebtedness incurred by its maker, the Milling Company, under a contract by which, in 1919, it obligated itself to pay to the plaintiff the aggregate amount of $34,376 for machinery purchased from the plaintiff and installed in its flour mill at Pocatello. Under the contract, it is important to note, plaintiff retained title to the machinery until fully paid for. In addition to its obligations to plaintiff, the Milling Company owed debts to divers persons, aggregating in the summer and fall of 1920 approximately $182,000, the major portion of which was due to the defendant bank. Among the other large creditors was another bank in Pocatello, the Stockgrowers' Bank & Trust Company. The Milling Company was wholly unable to meet its obligations, and after a prolonged conference of its officers and the representatives of its several creditors, not including plaintiff, held at Pocatello in the fall of 1920, an understanding was reached, pursuant to which on October 11th it executed a mortgage upon its plant, including the plaintiff's machinery therein installed, to the two banks as trustees, for the benefit of themselves and other creditors, not including plaintiff, to secure the payment, one year after date, of all indebtedness, computed at that time to be $182,193.36. The mortgage was expressly made subject to plaintiff's right to reclaim the machinery in the plant under its title-retaining note, unless the amount remaining due on account thereof was paid.

Apparently as part of the same transaction of temporary adjustment, plaintiff consented to extend the time for payment of the balance due it in consideration of a guaranty by the two banks, and accordingly upon October 16, 1920, the Milling Company transmitted to plaintiff its promissory note for $19,134.35, dated October 11th, the same day the mortgage was executed, and due one year after date, which was also the maturity date of the mortgage. The note bore an indorsement of guaranty by the defendant bank similar to that here in question, the Milling Company's letter of transmittal explaining that the other bank had in the meantime closed its doors, and hence its guaranty could not be secured. The note so guaranteed by the defendant was accepted by the plaintiff, and this was the origin of the note and guaranty in suit.

In 1921, when the note became due, through its president, defendant urged upon plaintiff a further extension, and after some negotiations the latter agreed to give additional time on condition that the amount be reduced to $15,000; and accordingly something over $4,000 was paid to it by defendant, and a new note was executed by the Milling Company, and, bearing the indorsement of guaranty by the defendant, was transmitted to and accepted by the plaintiff. When this became due, upon a plea by defendant for a further short extension, the present note was given and accepted in the manner already explained. In the meantime conditions had been unfavorable for the milling business, and as is to be inferred from what has already been said the Milling Company was unable to meet its obligations, and failed in all of its plans for permanent financing. In order to continue the operation of the mill, it had become necessary for one of the creditors, a wholesaler of grain and grain products, to take over the plant under lease; the lease period beginning September 1, 1921.

In the light of these and other facts disclosed by the record, the salient features of the situation may be thus stated:

On default of the Milling Company in July, 1920, to make payment to plaintiff of the amount remaining due under the contract, the latter had the legal right to reclaim the machinery and remove it from the plant. To have so removed it would not only have taken from the Milling Company, for an indebtedness of $20,000, an asset inherently worth approximately $35,000, but also, because of the interruption to defendant's business necessarily resulting from such a course, and its financial inability to rehabilitate the plant, to say nothing of the moral effect, the removal would have been disastrous, not only to the Milling Company, but to the interests of creditors. Hence, to protect their interests, it became necessary for the creditors either to pay plaintiff's claim or by some inducement to secure an extension of time for the payment thereof. The latter course was pursued. Surely it would not be contended that the defendant, with its large credit in jeopardy, was powerless under the law to protect itself by the other alternative; that is, by purchasing and taking over the claim. But, if that course was legitimately open to it, what valid reason can be assigned for denying it the other and less

onerous alternative? Plaintiff's security under its title-retaining note was abundant, and by making good its guaranty the defendant could at any time have been subrogated to plaintiff's rights.

During the period in question, as a matter of common information, we know that the financial situation throughout this section of the country was extremely sensitive, and, as is to be inferred from the record, banking in Pocatello was in a precarious condition. One of the banks holding a large credit against the Milling Company had failed. And it is further to be inferred that the defendant was not in position, without imperiling its solvency, to further extend its credits by taking over a $20,000 claim against the Milling Company. It could more safely protect itself by assuming the obligation under consideration. It is to be added that by thus taking care of the plaintiff's claim, and keeping the milling plant intact, it was possible to continue the operation of the plant, and during the period of the lease there was paid to defendant, as trustee, the net amount of $36,196.93, on account of rental, out of which amount, after paying taxes and other charges against the property, and reimbursing defendant for over $4,000 it had advanced in reducing the plaintiff's claim from $19,000 to $15,000 at the time of the first renewal of the Milling Company's note to plaintiff, it received as its distributive share, to be applied upon its general claims against the Milling Company, a little over $12,000. It will thus be seen that out of the proceeds of the operation of the mill, made possible by the guaranty in question, defendant, as trustee, received funds sufficient fully to discharge the guaranteed obligation, which it might very properly have paid as a prior lien before paying dividends to creditors; and out of the fund it received in its own right and applied upon other claims which it held an amount equal to three-fourths of the guaranteed claim. Under all the circumstances, the guaranty is thought to have been, not only a reasonable, but a necessary, incident to its banking business, and clearly within the scope of its power to execute.

Discussing the powers of a national bank, which are not thought to be greater than those of a state bank under the Idaho laws, in the case of First National Bank v. National Exchange Bank, 92 U. S. 122, 23 L. Ed. 679, Mr. Chief Justice Waite said:

"Authority is thus given to transact such a banking business as is specified, and all incidental powers necessary to carry it on are granted. These powers are such as are required to meet all the legitimate demands of the authorized business, and to enable a bank to conduct its affairs, within the general scope of its charter, safely and prudently. This necessarily implies the right of a bank to incur liabilities in the regular course of its business, as well as to become the creditor of others. Its own obligations must be met, and debts due to it collected or secured. The power to adopt reasonable and appropriate measures for these purposes is an incident to the power to incur the liability or become the creditor."

See, also, Roebling v. First National Bank (D. C.) 30 F. 744; First National Bank v. Bannister, 7 Kan. App. 787, 54 P. 20; Lowe v. Ring, 106 Wis. 647, 82 N. W. 571; McCraith v. National N. V. Bank, 104 N. Y. 414, 10 N. E. 862; Reynolds v. Simpson, 74 Ga. 454, and other cases cited at the foot of this opinion.

[3] There remains for consideration the question of Mrs. Greene's authority. It is undoubtedly true that no formal action was taken by the board of directors. It is further apparently true that three of the directors were without knowledge that the guaranty was to be executed, or that it had been executed, until after the lapse of considerable time. The other two directors were Mrs. Greene herself and her husband. As already stated, it is shown that Mrs. Greene had been the active managing head of the bank for approximately eight years. To one familiar with the usual course of business in a comparatively small bank in a comparatively small community, this fact suggests the probability of the frequent exercise by such an officer of very wide discretion without action on the part of the board, and without consultation with all of the directors. Upon the point, Mrs. Greene testified that often there were discussions of different matters that came up, and that she was supposed to use her own judgment without any regular action being taken; that she had been the active managing head of the bank during the time she had been president, and that her authority was such that she took action in many instances without previous authorization by the board, and in instances involving as much money as is involved in this case.

It is further shown that at the prolonged conference in the fall of 1920, culminating in the execution of the mortgage, much of the time all of the directors were present, but that Mrs. Greene was generally the spokesman for the bank. In this confer-

ence, the superior right of the plaintiff, under its title-retaining note, was always recognized, and it must have been known by all parties that the Milling Company was in default in respect thereto. While the three directors testified that they did not know the defendant bank was to guarantee the note, it must have been understood that in some way the claim would have to be taken care of, and that, to protect the interests of the creditors under the mortgage, the trustees named in the mortgage, the defendant and the other bank, would be under the necessity of in some way satisfying the plaintiff or suffer the disastrous consequences of having the machinery removed from the plant. The first note, with defendant's guaranty indorsed thereon, was given immediately thereafter. One of the directors testified that the only knowledge he had, even of the mortgage, he got from the public record thereof.

There is no suggestion in the record, or even ground for suspicion, that in guaranteeing the note Mrs. Greene acted with any ulterior motive, or consciously concealed anything from the directors, or any of them. She had no personal interest to serve, and so far as appears she acted in the utmost good faith, with a desire only to protect her bank and serve its interests. The conviction is unavoidable that she believed that, under the usages of the bank and the discretion she customarily exercised with the knowledge and consent of the directors, she had the authority to execute the undertaking. Upon the other hand, the plaintiff had no motive for concealment, or for withholding the transaction from the knowledge of the directors. It was abundantly secured. It sought no favor from the defendant, but, on the other hand, it was importuned by the Milling Company and the defendant to grant an extension, and thus assist its debtor and the creditors in avoiding unnecessary sacrifice. It had no reason for refraining from requiring formal action of the board of directors as a condition to granting the favor. The conclusion is unavoidable that, from its business experience and its transactions with banks, it assumed that the active managing head of the defendant bank had the implied authority to protect the interests of the bank by giving the guaranty.

Under the circumstances, it is thought to be significant that the officers and agents of the plaintiff, with their wide business experience, and Mrs. Greene, with her intimate knowledge of the usual course of business in the defendant bank, with no selfish interest on either side, or motive of concealment, assumed that Mrs. Greene had the authority to obligate her bank. With the knowledge they had of the plight of the Milling Company's affairs, and of the necessity of taking care, in some way, of plaintiff's superior claim, what explanation can be suggested of the inactivity of the directors and their failure to give their personal attention, other than that they were content to commit the whole matter to Mrs. Greene's discretion? And, when we consider all of the circumstances, what valid reason can be assigned for holding that the transaction was extraordinary, or of such a character that it required the express and formal authorization of the board?

The defendant bank had a mortgage upon the property to secure claims due it from the Milling Company in excess of $100,000. Had there been a prior mortgage for $15,000, upon which there had been a foreclosure and sale, and the period of redemption was about to expire, could not the managing head of the bank have either paid the prior lien or guaranteed it, in order to save the valuable equity in the property as security for its mortgage claim? Or in such a case, if there were taxes upon the property, amounting to $15,000, could not the managing head of the bank pay the taxes without formal action of the board, or even consultation with the members of the board? The situation here was quite as critical as in either of the supposed cases. The plaintiff company held title to a vital unit of a valuable plant, upon which there was due less than half of the original cost of such unit. The obligation was in default, and plaintiff had the right to remove the machinery with disastrous consequences to defendant's mortgage security as hereinbefore explained. It is thought to be clear that the managing head of the defendant, with an interest of more than $100,000 to protect, not only had the apparent, but the actual, authority either to pay the claim or to guarantee it; the guaranty being less onerous than the payment.

I do not attempt to review in detail the numerous decided cases cited in the briefs. Upon principle it is thought the following tend to support the conclusions reached, and they are representative: People's Bank v. National Bank, 101 U. S. 181, 25 L. Ed. 907; Merchants' Bank v. State Bank, 77 U. S. (10 Wall.) 604, 19 L. Ed. 1008; Martin v. Webb, 110 U. S. 15, 3 S. Ct. 428, 28 L. Ed. 49; Cherry v. City N. Bank, 144 F. 587, 75 C. C. A. 343; Keyes v. Security State Bank (C. C. A.) 300 F. 897; Farmers' & Merc. Bank v. Alderman (Neb.) 199 N. W.

548. Aldrich v. Chemical National Bank, 176 U. S. 618, 20 S. Ct. 498, 44 L. Ed. 611, and Auten v. U. S. Nat. Bank, 174 U. S. 141, 19 S. Ct. 628, 43 L. Ed. 920, should perhaps be cited as explaining and limiting the application of expressions found in related decisions of both the Supreme Court and of the lower federal courts, particularly in Western N. Bank v. Armstrong, 152 U. S. 346, 14 S. Ct. 572, 38 L. Ed. 470. See Chemical Nat. Bank v. Armstrong (C. C.) 50 F. 798; Id., 59 F. 372, 8 C. C. A. 155, 28 L. R. A. 231; Id., 65 F. 573, 13 C. C. A. 47, 28 L. R. A. 231; Id. (C. C.) 76 F. 339; Armstrong v. Chemical Nat. Bank, 83 F. 556, 27 C. C. A. 601.

Central Transportation Co. v. Pullman's Palace Car Co., 139 U. S. 24, 11 S. Ct. 478, 35 L. Ed. 55, a case much relied upon by the defendant, is mainly concerned with the status of a contract ultra vires, strictly speaking, and is not thought to be out of harmony with the conclusions we have reached. The language of Bowen v. Needles N. Bank, 94 F. 925, 36 C. C. A. 553, must be read with reference to the facts of the case, which disclose what apparently was a purely accommodation undertaking.

Judgment will be entered for the plaintiff.