CHEMICAL NAT. BANK OF NEW YORK v. ARMSTRONG.

(Circuit Court, S. D. Ohio, W. D. October 13, 1896.)

1. NATIONAL BANKS.
    A national bank has power to borrow money on call for the purposes of its business.
2. SAME—AUTHORITY OF PRESIDENT—BORROWING MONEY.
    A vice president of a national bank, who is the acting president, may, in conformity with established custom, without special authority from the board of directors, borrow money on behalf of the bank from another bank. Bank v. Armstrong, 14 Sup. Ct. 572, 152 U. S. 346, distinguished.
3. SAME.
    A bank dealing with the chief executive officer of another bank has a right to trust in his integrity, and transact business with him accordingly, there being nothing in the known state of the affairs of his bank or his relations to it to excite suspicion.

Wm. Worthington, Roosevelt & Kobbé, and Geo. H. Yeaman, for complainant.

John W. Herron, for respondent.

SAGE, District Judge. Upon complainant's appeal the decree of this court in its favor was affirmed as to the amount due as principal, but modified as to the interest. Before the decree of the appellate court was entered, the case of Bank v. Armstrong, 152 U. S. 346, 14 Sup. Ct. 572, was decided. Thereupon the defendant, in view of that decision, petitioned for a rehearing, on a ground of error assigned, but not pressed upon the attention of the court, nor referred to in its decision, to wit, that the court below erred in finding that the Fidelity Bank was indebted to the complainant. The rehearing was granted, and resulted in a reversal of the decree below, "with leave to parties to adduce further evidence upon the issue whether the Fidelity Bank owes anything to the Chemical Bank by virtue of the al-

leged loan." The loan, which was of $300,000, was made by complainant March 2, 1887, upon an application in writing, over the signature "E. L. Harper, Vice President," on a letter-head sheet of the Fidelity Bank, and dated and mailed at Cincinnati February 28, 1887, as follows: "Enclosed herewith we hand you for cr. our certificate of deposit No. 345, with bills collateral as follows: [Here was inserted list of collaterals, aggregating $326,695.30.] We desire to keep a large reserve with you, and we trust you will make the rate as low as you proposed some time since."

On the 2d of March the cashier of the Chemical Bank wrote and mailed a letter acknowledging receipt of the above, and adding, "We credit Fidelity National Bank $300,000, and shall be considerate as to rate when the loan is paid." The transaction was entered in the call loan book of the Chemical Bank as—

"Loan No: 1,070, March 2, 1887. Fidelity National Bank, $300,-000. Receivables, $326,695.30."

The directors of the Fidelity Bank did not authorize or consent to, or until the failure of the bank know of, this loan. It was not entered on the books. The bookkeeper and general accountant first knew of it after the failure of the Fidelity Bank. On the 2d of March, the date when the loan was made, Harper gave to the general bookkeeper a charge ticket, and directed him to place it to his credit, which was done. That ticket read as follows: "Credit check. Transfer of funds, E. L. H. $300,000. Charge Chemical N. Y." At the same time the charge of $300,000 was made against the Chemical Bank. The entire transaction was fraudulent and criminal on the part of Harper, who was then engaged in wrecking the bank for his own speculative purposes.

By the evidence adduced upon the rehearing it is established that, prior to the decision of Bank v. Armstrong, it was customary and usual for one national bank to borrow money from another, and that it was regarded by bankers as legitimate and in the line of banking business to do so, without any special authority from the board of directors by resolution or otherwise, nor was such authority ever required by the bank making the loan. The president, vice president, and cashier severally were treated as having authority to make loans on behalf of the bank; in other words, such transactions were recognized as being within the scope of their general duties. Transactions taking the form of the loan involved in this case, some covering large amounts, but none so large as this, are referred to by officers of banks, in their testimony, as not infrequent. The cashier of the Chemical Bank, in his deposition in this cause, given March 12, 1891, years before the decree of Bank v. Armstrong, testified that it was customary for one bank to borrow money from another bank in that way, and that such transactions were quite common. His language was:

"It is a customary way for banks in the West and South to borrow in that manner, for several reasons: First, it increases their deposit line; and, in the second place, they do not have to show a rediscount on a loan; and hence it is a very common thing for loans to be made of that character,—a certificate of deposit with a mass of collaterals attached."

The president of the Chemical Bank, having had 40 years' experience, testifies that prior to Bank v. Armstrong it was a usual' thing for one bank to borrow money from another bank; that loans were effected by rediscount of bills receivable, or by the bank's note secured by collateral, or by a certificate of deposit; that the president, vice president, or cashier acted for the borrowing bank; that no special authority from the directors was ever required; and that the decisions of the courts in that state were specific on that point; also that it made no difference as to the amount of the loan.   To the same effect is the testimony of the president of the American Exchange Bank of New York, speaking from 33 or 34 years' experience; also the testimony of the president of the Third National Bank, an ex-comptroller of the currency at Washington, ex-superintendent of the bank department of the state of New York, and an ex-bank examiner; the cashier of the Importers' & Traders' Bank, the president of the First National Bank, and the president of the Gallatin National Bank,— all of the city of New York.   All this testimony is uncontroverted, and it is quite significant that, although Receiver Armstrong was himself an old and experienced banker, it was not until after the decision of Bank v. Armstrong that the point was made that the negotiation of the loan upon which this suit is based was outside the ordinary course of business in banking, and not within the authority or the line of the duties of the vice president of the Fidelity Bank.

In Bank v. Armstrong the answer denied that the complainant had loaned the sum claimed or any other sum to the Fidelity Bank; averred that the notes mentioned in the bill made by Gahr and indorsed by Harper were discounted by the complainant for Harper by whom the proceeds of the discount were received; that the discounted notes were at no time the property of the Fidelity National Bank, and that that bank never had any interest in the transaction, and was in no way responsible therefor.   Upon the hearing the bill was dismissed by the court below, and the dismissal was affirmed by the supreme court.   The opinion begins with the statement that "whether the transaction of May, 1887, was a discount by the Western National Bank of New York in favor of E. L. Harper of the four notes made by A. P. Gahr and indorsed by Harper, or was a loan by said bank to the Fidelity National Bank, is the question principally discussed in the briefs and oral arguments of the respective parties." Justice Shiras, speaking for the court, proceeded:

"The theory that the case was that of a simple discount by the New York bank of four promissory notes, made by Gahr and indorsed by Harper, and secured by the assignment by Harper of certificates of 1,600 shares of the stock of the Fidelity National Bank, comports with the form of the notes themselves.   Such a transaction would have been an ordinary one, and in the course of the usual business of such a bank.   The letter of May 16, 1887, in which the proposition was made to the New York bank to make the loan, was signed by E. L. Harper in his own name, without any official designation."

The letter of application for the loan was written on the letterhead paper of the Fidelity Bank, and the proceeds of the discount were placed to its credit and drawn out by its drafts.   It appeared that it was understood by the New York bank that the application

came from the Fidelity Bank. But it further appeared that the drafts against the proceeds, although in the name of the bank, were drawn, some by Harper, others by his direction, and appropriated by him to his own use, or at least it did not appear "that the bank ever got a penny of the borrowed money, or any benefit or advantage what-ever by reason of the transaction." The court said that "it could not be pretended that Harper, as principal executive officer of the bank, had power, without authority from the board, to bind the bank by borrowing $200,000 at four months' time." The court continued:

"It might even be questioned whether such a transaction would be within the power of the board of directors. The powers expressly granted are stated in the eighth section of the national bank act (Rev. St. § 5136, par. 7): A national bank can 'exercise by its board of directors, or duly authorized officers or agents, subject to law, all such incidental powers as shall be necessary to carry on the business of banking, by discounting and negotiating promissory notes, drafts, bills of exchange and other evidences of debt; by receiving deposits; by buying and selling exchange, coin and bullion; by loaning money on personal security and by obtaining, issuing and circulating notes.'

"The power to borrow money or to give notes is not expressly given by the act. The business of the bank is to lend, not to borrow, money; to discount the notes of others, not to get its own notes discounted. Still, as was said by this court, in the case of First Nat. Bank v. National Exch. Bank, 92 U. S. 122, 127, 'authority is thus given in the act to transact such a banking business as is specified, and all incidental powers necessary to carry it on are granted. These powers are such as are required to meet all the legiti-mate demands of the authorized business, and to enable a bank to conduct its affairs, within the general scope of its charter, safely and prudently. This necessarily implies the right of the bank to incur liabilities in the reg-ular course of its business, as well as to become the creditor of others.'

"Nor do we doubt that a bank, in certain circumstances, may become a temporary borrower of money. Yet such transactions would be so much out of the course of ordinary and legitimate banking as to require those making the loan to see to it that the officer or agent acting for the bank had special authority to borrow money.'

"Even, therefore, if it be conceded that it was within the power of the board of directors of the Fidelity National Bank to borrow $200,000 on time, it is yet obvious that the vice president, however general his powers, could not exercise such a power unless specially authorized so to do, and it is equally obvious that persons dealing with the bank are presumed to know the extent of the general powers of the officers."

There was not only no evidence that Harper had the authority claimed for him, but also there was no evidence that the negotia-tion of a loan, or the borrowing of money, was part of or incident to the transaction of banking business between Cincinnati, a com-mercial center, and New York, the commercial metropolis, of the United States. The decision in Bank v. Armstrong is to be recog-nized as the authoritative statement of the law,—and certainly this court has no disposition to otherwise regard it,—but it is to be taken with reference to the facts as they there appeared. It is a decision to be carefully limited, and not to be stretched or enlarged by construction or in application. It is true, upon the facts of that case, that the business of the bank was "to lend, not to borrow, money; to discount the notes of others, not to get its own notes dis-counted"; and it is true in a certain general sense. But that the supreme court did not intend by the use of that language to lay down a rigid, inflexible rule, applicable to all cases and under all circum-

stances, is apparent from the reference to and the quotation from First Nat. Bank v. National Exch. Bank, 92 U. S. 127, which follows in immediate juxtaposition in the opinion as already cited and copied herein. This view is made more clear by the fact that, immediately after this quotation, the opinion proceeds, "Nor do we doubt that a bank, in certain circumstances, may become a temporary borrower of money," adding that by reason of the extraordinary character of such transactions it would be the duty of the lender to see to it that the officer or agent acting for the borrowing bank had special authority. The court then say:

"Even, therefore, if it be conceded that it was within the power of the board of directors of the Fidelity National Bank to borrow $200,000 on time, it is yet obvious that the vice president, however general his powers, could not exercise such a power unless specially authorized so to do, and it is equally obvious that persons dealing with the bank are presumed to know the extent of the general powers of the officers."

"If it be conceded," or the corresponding phrase, "however that may be," in a judicial opinion, may generally (not always) be taken as indicating that what is said upon the point referred to is not to be understood as the expression of an absolute, final conclusion, but as signifying that there is at least a tinge of obiter in what is thus qualified.

All these considerations, together with the circumstances that the entire discussion of the right of a national bank to borrow money is introduced in the opinion after the finding that the transaction involved was upon its face and upon the facts an individual transaction to which the Fidelity Bank was not a party, and for which it was not liable (that finding being decisive, and rendering the discussion of the power of a national bank to borrow money unnecessary,—which is always to be taken into account in determining the weight of an authority), lead this court to the conclusion that the supreme court in Bank v. Armstrong was dealing with and deciding the case before it upon its facts and circumstances, without intending to lay down a rule or establish a precedent applicable to all cases, or even generally. The question of the authority requisite to enable its officers to conduct such transactions will be considered later. What is the proper business of a bank, and what incidental powers may be necessary to carry on the business of banking, is not purely a question of law, nor altogether a question of fact. It is a mixed question of law and fact, depending, as to fact, upon circumstances and location. For illustration, a witness in this case, vice president of one of the largest banks in Cincinnati, testified that while, since the decree in Bank v. Armstrong, he had made it a rule to consult his board of directors, "he would consider it his duty, if there was a run on his bank and he had good bills receivable, to discount those bills, and if he couldn't see his directors it wouldn't take him long to rediscount the bills without consulting them." No one will question that he would be justified in so doing, and that the bank would be bound; and no one would hesitate to say that if he should decline to so do because he could not get his directors together, and therefore should suffer his bank to fail, he would be

grossly derelict. Then, again, the locality of the bank, the nature of its business, and the time of the transaction, may have much to do with determining what incidental powers are necessary to carrying on the business of banking. It is in testimony in this case that country banks in agricultural districts often borrow, sometimes heavily, at certain seasons of the year, from Cincinnati banks to provide for the movement of crops. At other seasons borrowing money might be entirely foreign to the legitimate business of banking, and in other localities it might be so regarded at any season, unless upon some extraordinary emergency. . A cashier engaged in banking business for more than 20 years testified to frequent loans by city banks to country banks. In "fifty to sixty hundredths of the cases" the transactions took the shape of rediscounting paper; in many cases the loans were on county or municipal bonds. He referred to instances,—one of a loan on bonds and securities of $150,000, and to rediscounts from $100,000 to $150,000,—and added that nine-tenths of the loans were made by the officers without consulting the board, and that if the officers were satisfied with the security the amount of the loan made no difference; that is, within the one-tenth limit, which they never exceeded. Now, the city banks sustain to the banks of other cities, and especially to those of the city of New York, a relation in many respects similar to that of the country banks to the city banks. The difference is that between cities, and especially between the interior cities and New York, the transactions are heavier, the exchanges are often of larger amounts, and they may occur at any season of the year. The witness last above referred to testified that St. Louis, the day before he gave his deposition, transferred $50,000 to New York to the credit of his bank. It may be said that it would be an easy thing for the directors to confer upon its officers by express terms the requisite authority. But the question is not now how the authority shall be conferred, or by whom exercised, but whether such transactions belong to the business of banking. By the evidence this case is clearly distinguishable from Bank v. Armstrong, and such transactions are, as matter of fact, proven to be included in the business of banking. They are also included as matters of law, because by section 5136, Rev. St., power is granted to every national bank to "exercise by its board of directors, or duly authorized officers or agents, subject to law, all such incidental powers as shall be necessary to carry on the business of banking, by discounting and negotiating promissory notes, drafts, bills of exchange, and other evidences of debt; by receiving deposits; by buying and selling exchange, coin, bullion; by loaning money on personal security; and by obtaining, issuing and circulating notes." When the supreme court, in commenting upon this section, said that "the power to borrow money or to give notes is not expressly given by the act," and added, "The business of the bank is to lend, not to borrow, money; to discount the notes of others, not to get its own notes discounted,"—it was setting forth in crystallized form what it deemed to be the substance of the provisions of the section, rather than stating a conclusion or formulating a rule. Accordingly, in the very next sentence, it cites with approval First Nat. Bank v. National

Exch. Bank, quoting the passage which indicates that section 5136 is not to be so strictly construed as to limit the incidental powers to precisely the things specified in the section; for, after stating that these powers are such as are required to meet all the legitimate demands of the authorized business, and to enable a bank to conduct its affairs within the general scope of its charter safely and prudently, it adds, "This necessarily implies the right of a bank to incur liabilities in the regular course of its business, as well as to become the creditor of others." As is suggested by counsel for complainant, the enumeration of powers in section 5136, though clear, is not put in a strictly logical order. Without changing its meaning it might be paraphrased so as to read:

"To carry on the business of banking by discounting notes, drafts, bills of exchange and other evidences of debt, by receiving deposits, by buying and selling exchange, coin and bullion, by loaning money on personal securities, and by obtaining, issuing, and circulating notes according to the provisions of this act, and to exercise by its board of directors, or duly-authorized officers or agents, subject to law, all such incidental powers as shall be necessary to carry on such business of banking."

This case is also distinguishable from Bank v. Armstrong in that there the court find that the transaction was in form, as well as in fact, an individual one, and that finding alone was decisive of the case. The court below had entered its decree upon that ground, for it did not touch upon the question of authority or power, which was not even suggested. Here the transaction was in form on behalf of the Fidelity Bank. Neither the power nor the authority of Harper was questioned in the court below, nor was the liability of the bank. The litigation was exclusively concerning the amount due and the interest. So it was in the court of appeals, until after the opinion in Bank v. Armstrong was filed in the supreme court. Again, there the loan was for four months; here it was on call,—a very important difference. Upon the evidence, the finding of this court is that the power of the Fidelity to borrow money by conducting such a transaction as is involved in this case is established, and that the same is legitimately within the business of banking under the national bank act.

The remaining question is whether Harper had authority to conduct the transaction. He was vice president and acting president,—the chief executive officer of the bank. His position made him a vice principal,—a representative of the bank,—not merely its servant or employé. From the nature and necessities of the business of banking, and the constantly occurring instances or emergencies when success or failure in the conduct of the particular transaction depends upon the executive ability, the judgment, and the decision of the officer representing the bank, in reference to points which could not have been anticipated and which must be promptly and without hesitation settled, it is evident that a large discretion must be vested in such officers. To require special authority for their acts would so embarrass the conduct of the business as to seriously interfere with, if not entirely prevent, the prosperous conduct of its affairs. Hence such officers stand among the highest in the rank of gen-

eral agents. Their position warrants the implication of the authority necessary to the performance of their duties, and when proof is made that transactions of the nature of that now under consideration have, for more than 20 years in and about the city of Cincinnati and the city of New York, been conducted by them not only without special authority in each instance, but without any direct authority from their board of directors (in very many instances, indeed generally, without even consulting them, and without any authority whatever except that to be inferred from long-established custom and usage, which is as good in the case of a corporation as in the case of an individual), it can hardly be maintained that more must be shown. The conclusion of this court is that the authority of Harper in this case is sufficiently established.

The point was made in the brief that the amount of the loan—$300,000—was sufficient to excite suspicion, and put the complainant upon inquiry. That might be argued with much force if there was in the then known condition of the Fidelity Bank anything to indicate that its funds were being abstracted by its vice president for his own speculative purposes, or that there was any irregularity in the conduct of its business. On the contrary, the unlawful and criminal operations of Harper were not publicly known, or known to the president or board of directors of his own bank, until they were brought to light by the failure in June, more than three months after the loan by the Chemical. At the date of that loan the affairs of the Fidelity Bank were apparently prosperous. It appears in evidence that single loans of from $100,000 to $150,000 had been made by Cincinnati banks to country banks, and that such transactions were recognized in the ordinary course of banking business, and that it was the custom of New York banks to make heavy loans to Western and Southern banks. Why, then, should the Chemical—having no possible motive to enter upon an irregular transaction, and expecting only a low rate of interest, acting upon an application regular upon its face, with bills receivable as collateral, everything being in the usual and customary form, not knowing and not having the means of knowing anything whatever to excite suspicion, there being nothing which the most careful inquiry would have disclosed—have hesitated to make the loan? In this connection the statement of the law with reference to the vigilance required of bank directors by Lord Moncreiff in his charge to the jury upon the trial of the directors of the City of Glasgow Bank is in point:

"A director is generally a man who has other avocations to attend to. He is not a professional banker. He is not expected to do the duty of a professional banker, as we all know. He is a man selected from his position, from his character, from the influence he may bring to bear upon the welfare of the bank, and from the trust and confidence which are reposed in his integrity and in his general ability. But I need not say that it is no part of his duty to take charge of the accounts of the bank. He is entitled to trust the officials of the bank who are there for that purpose, and as long as he has no reason to suspect the integrity of the officials it can be no matter of imputation to him that he trusts to the statements of the officials of the bank acting within the proper duties of the department which has been entrusted to them." Trial of the Directors of the City of Glasgow Bank, p. 433.

If such be the rule as to directors, I see no reason why, under the facts in this case, the extraordinary caution insisted upon by counsel should have been exercised by the Chemical. As long as Harper was accredited to the officers of the Chemical Bank as the chief acting executive officer of the Fidelity Bank, and there was nothing in the known state of its affairs, or of his relations to that bank, to excite suspicion, the officers of the Chemical had the right to trust in his integrity, and to conduct their transactions with him accordingly. I have already stated why, in my opinion, the rule in Bank v. Armstrong does not apply.

Counsel for complainant cite the New York banking act of 1838, containing almost the exact words of the seventh clause of section 5136, and the case of Curtis v. Leavitt, 15 N. Y. 9–52, quoting from Judge Comstock, that banking, "regarded as a business and not as a franchise, includes the borrowing of money as one of its features or incidents," and, after citing Bank of Australasia v. Breillat, 6 Moore, P. C. 152–194, proceeds to a discussion of the right of a bank to borrow money. After referring to the fact that in the New York act the power to borrow money is not found in the section containing the specifications relating to the business of banking, he adds: "If the statute had omitted the general term 'business of banking,' and had merely enumerated the power of issue and all others named in the eighteenth section, that would have been a general grant of banking powers, including as their incident the right to borrow money when a necessity may arise in the exercise of those powers" as incident to the business of banking. Counsel also cite Barnes v. Bank, 19 N. Y. 156, affirming Curtis v. Leavitt, and holding: "That the cashier, in virtue of his general employment, could exercise the power, was not denied upon the argument, and the proposition does not admit of a reasonable doubt." They also refer to Morse, Banks & Banking, § 63, and authorities quoted; also to Bank v. Earle, 13 Pet. 519, and Railroad Co. v. Kneeland, 4 How. 16. The case of Curtis v. Leavitt, decided in 1857, is valuable as evidencing that the borrowing of money by one bank from another bank was, years before the enactment of the national bank act, recognized by the court of last resort of the state of New York—the place of the transaction here involved—as included, both as a matter of fact as in law, in the business of banking. But the general question of law is not open for consideration in this court. Bank v. Armstrong is authoritative so far as it applies, and would control if this case were not distinguishable upon the facts, as has already been pointed out.

The decree will be for the complainant for the amount and with interest as directed by the mandate.