## Hines, Director General v. Thurman.

(Decided June 20, 1922.)

Appeal from Jefferson Circuit Court
(Common Pleas Branch, First Division).

1. Master and Servant—Assumption of Risk—Duty to Warn.—If a danger is known and appreciated by the servant, or it is so obvious that a person of ordinary prudence in his situation would have known and appreciated it, he assumes the risk and no warning is required; but if the danger is latent and unknown to the servant, but is known to the master or discoverable by the exercise of ordinary care, it is the duty of the master to warn the servant of the danger so that he may take the necessary steps to protect himself against it.

2. Master and Servant—Duty to Warn—Question for Jury.—In an action by a boiler helper to recover for an injury to his eye, caused by a sliver from a cold stay bolt which was being driven by an air hammer operated by another, evidence held to make it a question for the jury whether the danger was latent, and therefore such as to impose on the master the duty of giving proper warning.

B. D. WARFIELD and MOORMAN & WOODWARD for appellant.

BLAKEY & LEWIS and H. M. DENTON for appellee.

OPINION OF THE COURT BY JUDGE CLAY—Affirming.

Clarence Y. Thurman sued the Director General of Railroads for personal injury and recovered a verdict and judgment for $1,600.00. The Director General prosecuted an appeal, and thereafter John Barton Payne, agent of the President of the United States, was substituted as appellant.

The failure of the trial court to direct a verdict in favor of the Director General of Railroads is the only error relied on.

Thurman, who was thirty-six years of age, and had been working as an enameler at Ahrens & Otts', went to work for the railroad company on November 17, 1917,

and remained in its employ until April 22, 1918. For the first two or three days his work consisted of handing out taps. After that he did general work backing up the boiler makers. The men working on the boilers were known as boiler makers, handy men and helpers. Boiler makers and handy men did the same work, the only difference being that boiler makers had had more experience and received larger wages. . Thurman was a helper and it was his duty to assist the boiler makers and handy men in tearing down and repairing old boilers. On the morning of the accident Thurman was ordered by the foreman, Bruder, to back up the air gun used by Waterbury, a handy man, in driving stay bolts. Though Waterbury, as operator, had entire control of the gun, it was necessary for him to have a helper to assist in keeping the gun steady. Prior to working with Waterbury, Thurman had only backed up right-handed men, and his position was then directly behind the operator. Waterbury could work either right-handed or left-handed, and on the morning of the accident was working left-handed. The effect of this was to cause Waterbury to be on the left side of the hammer and plaintiff on the right side. Shortly after beginning the work a sliver of steel flew from the hammer or stay bolt, striking plaintiff in the eye and destroying the sight. Plaintiff claims that he was not experienced in the work and did not know of the danger. He had never seen slivers fly from cold stay bolts, but had seen them fly from hot rivets. Though he had seen boiler makers and handy men wear goggles for the protection of their eyes, he had never seen any helpers wear goggles nor had he been warned of the danger or told that it was necessary for him to wear goggles. After he had been there about six months, he drove three bolts himself, but with that exception, he merely performed the duties of a helper.

After explaining the difference between boiler makers, handy men and helpers, Ed. F. Westerman, a boiler maker, testified that he started to drive the bolts on the boiler that Thurman was working on, but he was taken off the work by Bruder, the foreman, and assigned to other work. When a boiler maker wanted an assistant he went to the foreman for that purpose. The boiler maker or handy man was superior in authority to his helper. He saw Thurman just before the accident, and Thurman did not have on any goggles. They had goggles for use in driving stay bolts with a hammer. He had a pair of

goggles and turned them over to another workman, and, if not mistaken, Bruder was to get a pair of goggles for the man that was with him. They were short of goggles on that occasion. When goggles were needed, the boiler maker would get them, and sometimes would send a helper to the foreman for them. He was driving stay bolts at the place where Waterbury afterwards worked. Hart was backing the gun. He left first and Hart took his place. At that time Hart was wearing goggles and Waterbury took his place. He did not know whether Thurman could have gotten goggles if he had asked for them. Some of the men who backed the gun wore goggles and some of them did not. He did not know how many sets of goggles they had and whether there was a set there for Thurman or not. He thought that Bruder had gone after some goggles for that job. They did not have any goggles in their gang, and Thurman, if he had wanted them, would have had to go around to the different gangs. Bruder said he would go and get some goggles, but he did not know whether Bruder went and got them or not. While the helpers were required to wear goggles, they grew careless about them. At one time they put a rule upon the bulletin board requiring everybody to wear goggles. That was before Thurman went to work and a long time before he got hurt.

W. J. Waterbury testified that he knew Thurman only as a shopman. At the time of the injury he himself was a handy man and was operating the air gun inside of the fire box. He could operate the gun either left-handed or right-handed, but on the occasion in question was operating it left-handed. The change required him to move from the right-hand side of the gun to the left-hand side.. When the change is made the helper may stay in same position or change to the other side. As to what the rules are in regard to goggles he could not state. They did not force you to use them, but they were there if you needed them. The helpers could get them if they went after them. He did not know how many goggles they had on hand. There were four men inside of the boiler, and they worked with an electric light. He relieved the man, Hart. When he relieved Hart he took Hart's goggles. Thurman was ordered by the foreman to be his helper. He used the goggles on the day of the accident. He had signed a statement that he never used goggles while backing up an air gun before the time Thurman was injured. Some of the helpers did and some did not.

There was no evidence that the place where Thurman was required to work was unsafe or that the appliances were defective, but it is insisted that the railroad was negligent in not warning him of the danger so that he might take appropriate steps to protect himself. On the other hand, the railroad contends that as the risk was one of those ordinarily incident to the business in which Thurman was employed it was under no duty to warn him of the danger. It may be conceded that there is no duty to warn of a danger incident to a risk assumed by the servant. The doctrine of assumed risk proceeds on the theory that the servant has actual or implied notice of the risk. Hence if the danger is known and appreciated by the servant, or it is so obvious that a person of ordinary prudence in his situation would have known and appreciated it, he assumes the risk and no warning is required. On the other hand, if the danger is latent and unknown to the servant, but is known to the master or discoverable by the exercise of ordinary care, it is the duty of the master to warn the servant of the danger so that he may take the necessary steps to protect himself against it. Gowen v. Bush, 40 U. S. App. 349, 76 Fed. 340, 22 C. C. A. 196; Wood v. Heiges, 83 Md. 257; United States Rolling Stock Co. v. Wilder, 116 Ill. 100. While there was evidence that prior to Thurman's employment there was a rule requiring helpers to wear glasses, and that some helpers wore them and others did not, there was no evidence that Thurman had notice of such a rule, or that such a rule was in force during the time of his employment, or that any helpers ever wore glasses in his presence, or that he was ever warned of the danger. On the contrary, he says that he was never warned of the danger or advised of the necessity of wearing glasses, and that he never saw any helpers wearing glasses. There being no evidence of actual notice of danger, the question is, was the danger so obvious to a person of ordinary prudence in Thurman's situation as to charge him with knowledge and appreciation of the danger, or was it a latent and hidden danger within the rule requiring the master to give warning thereof? As Thurman had been working as a helper for about six months, and during that time had seen boiler makers and handy men wear glasses for the protection of their eyes, and had also seen slivers fly from hot rivets, and as the application of the air hammer to the stay bolt would necessarily have the

effect of causing slivers to fly, the railroad insists that these facts were sufficient to charge him with knowledge and appreciation of the danger. It must not be overlooked that as Thurman always had worked immediately in the rear of the boiler makers or handy men until just before the accident, his opportunity for observing and appreciating the danger was necessarily limited. Moreover, he says that he never had seen any slivers fly from a cold stay bolt, and not a single witness says that any slivers were ever thrown off during the time of his employment. That being true, his experience did not apprise him of the danger, and we are not prepared to say that his knowledge of physical law was such as to charge him with notice of the fact that slivers might fly from a stay bolt when none had ever been thrown off before. On the contrary, we are of the opinion that the evidence was sufficient to make it a question for the jury whether the danger was latent, and therefore such as to impose on the company the duty of giving proper warning.

Judgment affirmed. Judge Moorman not sitting.